UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>  Plaintiff,<br>v.<br><br>REAL PROPERTY LOCATED AT 608 STANFORD STREET, UNIT A, HOUSTON, TEXAS 77019;<br><br>REAL PROPERTY LOCATED AT 608 STANFORD STREET, UNIT B, HOUSTON, TEXAS 77019;<br><br>REAL PROPERTY LOCATED AT 310 GODDARD WAY, IRVINE, CALIFORNIA 92618;<br>  Defendants. | CIVIL ACTION NO. ___ |

**VERIFIED COMPLAINT FOR CIVIL FORFEITURE
IN REM AND NOTICE TO POTENTIAL CLAIMANTS**

Plaintiff, the United States of America, by and through the United States Attorney, Alamdar S. Hamdani, and the undersigned counsel, Elizabeth Wyman, Assistant United States Attorney, files this action for forfeiture *in rem* against the above-captioned Defendant Properties. The United States respectfully alleges on information and belief as follows:

**NATURE OF THE ACTION**

1. This is a civil action *in rem* brought pursuant to 18 U.S.C. § 981(a)(1)(C), which provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in [18 U.S.C.] section 1956(c)(7) of this title), or a conspiracy to commit such offense." Pursuant to 18 U.S.C. § 1956(c)(7)(F), "any act or activity constituting an offense involving a Federal health care offense" is specified unlawful activity. A "Federal health care offense" is specifically defined in

1

18 U.S.C. § 24(a) to include violations of Title 18, United States Code, Sections 1347 and 1349 (health care fraud and conspiracy to commit health care fraud) and 42 U.S.C. § 1320a-7b(b) (payment and receipt of kickbacks).

2. This action is also brought to enforce 18 U.S.C. § 981(a)(1)(A), which provides for the forfeiture of "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 [of Title 18], or any property traceable to such property." Under 18 U.S.C. § 1956(a)(1)(B)(i), it is unlawful for a person to conduct or attempt to conduct a financial transaction with proceeds of a specified unlawful activity knowing that the transaction is designed, in whole or in part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. Under 18 U.S.C. § 1957, it is unlawful for a person to knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and that is derived from specified unlawful activity.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355(a), as well as *in rem* jurisdiction pursuant to 28 U.S.C. § 1355(b)(1).

4. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1355(b)(1), 1391(b), and 1395. Acts and omissions giving rise to the forfeiture occurred in the Southern District of Texas. In addition, the Defendant Properties located at 608 Stanford Street, Unit A and Unit B, Houston, Texas 77019 are within the Southern District of Texas.

5. Venue is further proper in this Court pursuant to 18 U.S.C. § 981(h). A criminal prosecution has been brought against Emylee Thai, who owns or may have an ownership interest in the Defendant Properties, in the Southern District of Texas based on violations "constituting

2

'specified unlawful activity' (as defined in [18 U.S.C.] section 1956(c)(7) of this title), or a conspiracy to commit such offense." *See* Section VI, *infra*.

## THE DEFENDANT PROPERTIES

6.  The Defendant Properties are the following real properties:

| Real Property | Address | Purchase Price |
|---|---|---|
| "Stanford A" | 608 Stanford Street, Unit A, Houston, Texas 77019 | $878,500.27 |
| "Stanford B" | 608 Stanford Street, Unit B, Houston, Texas 77019 | $965,000.00 |
| "310 Goddard" | 310 Goddard, Irvine, California 92618 | $3,750,000.00 |

## SUMMARY

7.  The conduct described in this Complaint involves violations of 18 U.S.C. § 1347, (health care fraud), 18 U.S.C. § 1349 (health care fraud conspiracy), 42 U.S.C. § 1320a-7b (anti-kickback statute), 18 U.S.C. §§ 1956(a)(1)(B)(i), 1957 (money laundering), and 18 U.S.C. § 1956(h) (money laundering conspiracy) in the Southern District of Texas and elsewhere. The conduct occurred in or about and between December 2019 and May 2022 and involves Emylee Thai ("Thai"), Lily Tran Daniel ("Tran"), Kenneth Reynolds ("Reynolds"), and their associates. Thai, Tran, and Reynolds are defendants in a criminal prosecution filed in the Southern District of Texas, Docket No. 4:22-CR-329, based on the same conduct described in this Complaint.

8.  In or about and between December 2019 and May 2022, Thai, Tran, Reynolds, and others conspired to defraud Medicare, a government health care program, of money and undertook certain acts to do so. For example, the conspirators paid kickbacks to doctors and/or employees at doctors' offices, performed medically unnecessary genetic tests, and submitted fraudulent claims to Medicare to obtain money. As part of the conspiracy, Thai established a genetic testing laboratory business named ApolloMDx, later renamed Artemis DNA, and opened bank accounts in the name of her company, as well as shell companies under her control. Thai used these accounts to receive money from Medicare and then redirected the proceeds to facilitate the conspiracy as

well as make purchases of real property, including the Defendant Properties, and other items. The scheme resulted in a loss of more than $95 million to the Medicare program.

## FACTUAL BASIS FOR FORFEITURE

### I. The Medicare Program

9. The Medicare Program ("Medicare") is a federally funded program that provides free and below-cost health care benefits to individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare are governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare & Medicaid Services ("CMS"), oversees and administers Medicare. Individuals who receive benefits under Medicare are commonly referred to as Medicare "beneficiaries."

10. Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

11. Medicare covers different types of benefits and is separated into different program "parts." Medicare "Part B" covers, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits and laboratory testing, that are medically necessary and ordered by licensed medical doctors or other qualified health care providers.

12. Medicare "providers" include independent clinical laboratories, physicians, and other health care providers who provide items or services to beneficiaries. To bill Medicare, a provider is required to submit a Medicare Enrollment Application Form ("Provider Enrollment Application") to Medicare. The Provider Enrollment Application contains certifications that the provider is required to make before the provider can enroll with Medicare. Specifically, the

Provider Enrollment Application requires the provider to certify, among other things, that the provider will abide by the Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and that the provider will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

13.	A Medicare "provider number" is assigned to a provider upon approval of the Provider Enrollment Application. A health care provider that receives a Medicare provider number is able to file claims with Medicare to obtain reimbursement for reasonable and necessary services provided to beneficiaries.

14.	A Medicare claim is required to contain certain information, including: (a) the beneficiary's name and Health Insurance Claim Number; (b) a description of the health care benefit, item, or service provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; (e) the name of the referring physician or other health care provider; and (f) the referring provider's unique identifying number, known either as the Unique Physician Identification Number or National Provider Identifier ("NPI"). The claim form may be submitted in hard copy or electronically.

15.	When submitting claims to Medicare for reimbursement, providers are required to certify that: (1) the contents of the forms are true, correct, and complete; (2) the forms were prepared in compliance with the laws and regulations governing Medicare; and (3) the services that were purportedly provided, as set forth in the claims, were medically necessary.

16.	Medicare claims are required to be properly documented in accordance with Medicare rules and regulations. Medicare will not reimburse providers for claims that were procured through the payment of kickbacks and bribes.

## II.     Medicare Coverage for Genetic Testing

17.     Genetic testing for cancer uses DNA sequencing to detect mutations in genes that may indicate a higher risk of developing certain types of cancers in the future. Genetic testing for cancer is not a method of diagnosing whether an individual presently has cancer.

18.     Genetic testing for cardiovascular disease uses DNA sequencing to detect mutations in genes that may indicate an increased risk of developing serious cardiovascular conditions in the future and may assist in the treatment or management of a patient who presently has signs or symptoms of a cardiovascular disease or condition. Genetic testing for cardiovascular disease is not a method of diagnosing whether an individual presently has a cardiac condition.

19.     Laboratories purport to offer other kinds of genetic testing using DNA sequencing to detect mutations in genes that could indicate an increased risk of developing diseases such as Parkinson's disease, Alzheimer's disease, dementia, diabetes, obesity, pulmonary diseases, and hearing loss (collectively, with genetic testing for cancer and cardiovascular disease, "genetic testing").

20.     For genetic testing, a beneficiary provides a saliva sample or cheek or nasal swab containing DNA material. The DNA sample is then submitted to a laboratory to conduct genetic testing. Tests are then run on different "panels" of genes. Genetic testing typically involves performing lab procedures that correlate with certain billing codes used by Medicare, each with its own reimbursement rate.

21.     DNA samples are submitted along with requisitions identifying the beneficiary, the beneficiary's insurance, and the specific type of genetic testing to be performed. In order for laboratories to submit claims to Medicare for genetic testing, the requisitions must be signed by a physician or other authorized medical professional, who attests to the medical necessity of the

6

genetic testing.

22. Medicare does not cover diagnostic testing that is "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare does not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1).

23. If diagnostic testing is necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposes additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provides, "All . . . diagnostic laboratory tests . . . must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." In addition, "tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

### III.  The Relevant Entities and Individuals

24. The allegations below relate to the time period relevant to this Complaint.

25. ApolloMDx, LLC ("ApolloMDx") was a Texas limited liability company with a principal place of business in Harris County, Texas. ApolloMDx was an independent clinical laboratory enrolled with Medicare that purportedly provided laboratory services and diagnostic testing, including genetic testing, to individuals, including Medicare beneficiaries.

26. Artemis DNA TX, LLC ("Artemis DNA") was a Texas limited liability company with a principal place of business in Harris County, Texas. Artemis DNA was the amended name for ApolloMDx with Medicare as of in or around December 2021, although it retained the same

7

NPI as ApolloMDx, and carried on the same business of purportedly providing laboratory services to individuals, including Medicare beneficiaries. This Complaint will refer to ApolloMDx and Artemis DNA collectively as "ApolloMDx."

27. Thai was a resident of Orange County, California, and Harris County, Texas, and the owner of ApolloMDx. Thai signed the Provider Enrollment Application, as well as additional documents submitted to Medicare, on behalf of ApolloMDx.

28. Tran, a resident of Orange County, California, referred DNA samples and signed doctors' orders for genetic testing to ApolloMDx.

29. Reynolds, a resident of New Castle County, Delaware, referred DNA samples and signed doctors' orders for genetic testing to ApolloMDx.

## IV.  The Criminal Conspiracies

30. Thai, Tran, Reynolds, and others conspired to unlawfully enrich themselves by, among other things: (a) soliciting, receiving, offering, and paying kickbacks and bribes in exchange for the referral of Medicare beneficiaries' DNA samples and arranging for doctors' orders for genetic testing to ApolloMDx; (b) submitting and causing the submission of false and fraudulent claims to Medicare for genetic testing that were procured through kickbacks and bribes, were not medically necessary, and were not eligible for reimbursement; (c) concealing and causing the concealment of kickbacks and bribes; and (d) diverting the proceeds for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

**A. Thai agreed to pay kickbacks and bribes in exchange for referrals.**

31. Thai certified to Medicare, through a Provider Enrollment Application submitted to Medicare, that she, as well as ApolloMDx, would comply with all Medicare rules and regulations and federal law, including that she would not knowingly present or cause to be presented a false

8

and fraudulent claim for payment by Medicare, and that she would comply with the Federal Anti-Kickback Statute.

32. Thai did not live up to her word. Instead, on or about January 22, 2020, she communicated with Tran regarding an illegal conspiracy to defraud Medicare in violation of federal statutes. The plan was for Tran to refer DNA samples and signed doctors' orders for genetic testing to ApolloMDx, in Houston, Texas. They agreed that Tran would refer DNA samples and signed doctors' orders for genetic testing to ApolloMDx, which would bill Medicare for the genetic testing, and that Tran would receive kickbacks and bribes for the referrals.

33. Likewise, in or around mid-2020, Thai agreed with another individual ("Marketer 1") to pay Marketer 1 thirty-five percent of the amounts Medicare reimbursed ApolloMDx on claims Marketer 1 and Marketer 1's sales representatives referred to ApolloMDx in Houston, Texas. Reynolds was one of Marketer 1's sales representatives.

34. Similarly, Reynolds and another individual ("Marketer 2") solicited and received kickbacks and bribes from Thai in exchange for referring DNA samples and signed doctors' orders for genetic testing, knowing that ApolloMDx would bill Medicare for genetic testing purportedly provided on behalf of these beneficiaries.

35. To encourage more referrals, on or about September 9, 2020, Thai sent Marketer 1 a Medicare billing statement showing that Medicare was reimbursing ApolloMDx approximately $8,295.72 for genetic testing for cardiovascular disease. Because Marketer 1 would receive thirty-five percent of that amount under Marketer 1's agreement with Thai, Thai's action incentivized Marketer 1 to increase referrals.

36. In addition, on or about September 25, 2020, Thai offered Marketer 1 an additional bonus if Marketer 1 and Marketer 1's sales representatives (including Reynolds) referred over a

thousand DNA samples to ApolloMDx before December 25, 2020.

37. These agreements violated the federal Anti-Kickback Statute.

**A.     The conspirators concealed their illegal agreements.**

38. To disguise the fact that Thai agreed to pay Tran a percentage of Medicare reimbursements in violation of the federal Anti-Kickback Statute, Thai signed a Marketing and Data Management Services Agreement with IDP Management LLC ("IDP management") on or about July 1, 2021. Although Tran's father signed the agreement with Thai, IDP Management was an entity controlled by Tran, and Tran was a signatory on IDP Management's bank account. The agreement provided that IDP Management would be paid a flat fee every quarter for certain services, and that the flat fee was based on the fair market value of the services IDP Management provided, not on the volume or number of referrals IDP Management generated for ApolloMDx. In reality, however, the flat fees concealed a fifteen percent commission that Tran was to receive from Medicare reimbursements on genetic testing she referred to ApolloMDx. To further conceal the kickbacks, Tran and Thai agreed that Tran would be paid flat fees across several different companies in an amount that covered Tran's commission. This allowed Thai to give the appearance of on-paper paying a fixed flat fee on a regular schedule and disguise the real (and illegal) commission arrangement between Tran and Thai. Tran also knew that the true agreement was for her to be paid a percentage of Medicare reimbursements, not a flat fee. For example, on or about July 21, 2021, Tran asked an ApolloMDx employee for assistance viewing ApolloMDx's claims data, explaining that while Tran could see "the total amount of my payments at 15%," she could not see the breakdown by doctor.

39. Similarly, on or about October 5, 2020, Thai and Reynolds signed a "Direct Marketing Services Contract" that purported to govern a marketing arrangement between

ApolloMDx and Snuggie & Snuggie, LLC ("Snuggie & Snuggie"), a company owned by Reynolds. The agreement provided that the compensation payable to Snuggie & Snuggie was purportedly to be based on the fair market value of services rendered and was to "bear absolutely no correlation to the volume or quantity of Leads, Records, or Clients." Contrary to this agreement, however, Thai paid or caused Reynolds to be paid compensation that was based on the volume Thai and Reynolds anticipated Reynolds could refer, which was an illegal kickback violation of the federal Anti-Kickback Statute.

40. In addition, on or about October 8, 2020, Marketer 1 and Thai discussed concealing Marketer 1 and Marketer 1's sales representatives' compensation arrangements with ApolloMDx by paying the sales representatives a "salary" instead of a commission based on Medicare reimbursements.

**B. Thai paid kickbacks and bribes to her co-conspirators.**

41. After Medicare paid ApolloMDx for the fraudulent claims, Thai paid her co-conspirators their promised kickbacks.

42. From on or about August 5, 2020, and continuing through on or about November 26, 2021, Thai paid approximately $396,000 from accounts she controlled ("Thai's Accounts") to a company ("Company 1") owned by Marketer 1.

43. From on or about April 5, 2021, and continuing through on or about November 26, 2021, Thai paid approximately $310,000 from Thai's Accounts to a second company ("Company 2") also owned by Marketer 1.

44. From on or about April 5, 2021, and continuing through on or about November 26, 2021, Thai paid approximately $630,000 from Thai's Accounts to the bank account of Snuggie & Snuggie, which was owned by Reynolds.

45. On or about December 4, 2021, Thai paid approximately $100,000 from Thai's Accounts to Marketer 2.

46. From on or about February 28, 2020, and continuing through on or about July 6, 2022, Thai paid approximately $11,697,247.00 to various bank accounts in the names of companies Tran controlled. For example, on or about February 23, 2022, Thai paid approximately $50,000 from Thai's Accounts to IDP Management, a company controlled by Tran.

47. Thai's payments to Company 1, Company 2, Snuggie & Snuggie, Marketer 2, IDP Management, and others were made by check and interstate wire from ApolloMDx's bank accounts or other bank accounts Thai controlled.

48. These payments to Company 1, Company 2, Snuggie & Snuggie, Marketer 2, and IDP Management constituted kickbacks paid in exchange for doctors' orders that Tran, Reynolds, Marketer 1, and Marketer 2 referred to ApolloMDx, and which ApolloMDx used to support claims submitted to Medicare. These referrals and claims resulted in Medicare paying reimbursements to ApolloMDx for genetic testing that was (1) procured through the payment of kickbacks and bribes, (2) medically unnecessary, and (3) ineligible for reimbursement.

49. Examples of Thai's payments to Tran, Reynolds, Marketer 1, and Marketer 2 are reflected in the chart below:

| Approximate Date of Payment | Approximate Amount | Description |
|---|---|---|
| December 4, 2020 | $25,000 | Wire Transfer from ApolloMDx account at HSBC to Company 1 account at TD Bank |
| December 4, 2020 | $100,000 | Wire Transfer from ApolloMDx account at HSBC to Snuggie & Snuggie account at Citizens Bank |
| December 4, 2020 | $100,000 | Wire transfer from ApolloMDx account at HSBC to Marketer 2 account at TD Bank |
| February 23, 2022 | $50,000 | Wire Transfer from ApolloMDx account at Morgan Stanley to IDP Management account at JP Morgan Chase |

Each payment was in violation of Title 42, United States Code, Section 1320a-7b(b)(2), and Title 18, United States Code, Section 2.

### C. Thai submitted fraudulent claims to Medicare.

50. From in or around December 2019 through May 2022, ApolloMDx submitted, via interstate wire, approximately $142 million in false and fraudulent claims to Medicare for genetic testing, including claims based on referrals received from Tran, Reynolds, Marketer 1, and Marketer 2 in exchange for kickbacks and bribes.

51. Thai, Tran, and others also altered and fabricated doctors' orders to reflect false diagnoses of beneficiaries' medical conditions to make the beneficiaries appear eligible for genetic testing. Thai, Tran, and others then submitted, and caused ApolloMDx to submit, these claims to Medicare for genetic testing listing the false diagnoses from the altered doctors' orders.

52. In addition, Thai, Tran, and others altered and fabricated doctors' orders to reflect false dates of service for beneficiaries' visits with medical providers to make it appear that DNA samples had been collected on multiple dates, when in fact they had been collected on a single date, so that ApolloMDx could bill Medicare for several dates of service. Thai, Tran, and others then submitted and caused ApolloMDx to submit claims to Medicare for genetic testing listing these false dates of service for beneficiaries' visits with medical providers.

53. From in or around December 2019 through May 2022, Thai, Tran, and others submitted and caused ApolloMDx to submit approximately $142 million in false and fraudulent claims to Medicare for genetic testing that was often (1) induced through kickbacks and bribes; (2) not medically necessary; and (3) not eligible for reimbursement. In reliance on the representations in the claims, Medicare paid approximately $95 million to ApolloMDx.

## V.     The Purchase of Defendant Properties

54.     The Defendant Properties in this matter were all purchased with funds from an HSBC account, with an account number ending 7467 ("HSBC 7467"), in the name of ApolloMDx.

55.     A Lowest Intermediate Balance Rule (LIBR) analysis was conducted on HSBC 7467 for the time frame of June 11, 2020, to November 30, 2020.[1] This time frame covers the purchase of the items the government seeks to seize. Transactions during this time frame have been assigned a percentage that represents the amount of proceeds in that transaction that was obtained through the illegal activities described in this Complaint.

56.     Thai entered into the transactions knowing the money used to purchase the Defendant Properties was criminally derived from her healthcare fraud scheme (which is a "specified unlawful activity" for the purposes of the money laundering statutes). The purchases of the Defendant Properties constituted violations of 18 U.S.C. § 1957, as each purchase required at least one financial transaction involving more than $10,000 in illegal fraud proceeds.

### A.     Stanford B

57.     On August 10, 2020, ApolloMDx purchased Defendant Property Stanford B. The total purchase price for the property was $965,000.00. The purchase was made with funds from HSBC 7467.

58.     On July 27, 2020, $20,000.00 was transferred from HSBC 7467 to Alamo Title Company as a down payment on the purchase of Stanford B. The LIBR analysis of account HSBC

---

[1]     LIBR analysis is an accepted method to determine whether fraudulently obtained proceeds are traceable to subsequent transactions. *See United States v. Jonas*, 824 Fed. Appx. 224, 228 n.2 (5th Cir. 2020) (noting with approval, "The [lowest-intermediate-balance rule] provides that where the balance of an account into which tainted proceeds are deposited subsequently dips below the amount of those tainted proceeds, the only tainted funds thereafter traceable to the account are funds equal to that lowest account balance.").

7467 showed that the $20,000.00 in this transaction was not proceeds of the illegal activity described above.

59. On August 7, 2020, $945,000.00 was transferred from HSBC 7467 to Alamo Title Company to complete the purchase of Stanford B. The LIBR analysis of the HSBC 7467 account showed that 80% of the $945,000.00, or $758,981.51, were proceeds of the illegal activity described above.

60. On April 23, 2021, title to Stanford B was transferred from ApolloMDx to 608 Stanford LLC. Texas Secretary of State records show that Emylee Thai is the only Managing Member of 608 Stanford LLC.

61. On April 22, 2022, title to Stanford B was transferred from 608 Stanford LLC to Happy Hearts Living Trust via Special Warranty Deed. The Special Warranty Deed reflects that Emylee Thai was the Trustee of the Happy Hearts Living Trust.

**B.  Stanford A**

62. On September 9, 2020, ApolloMDx purchased Defendant Property Stanford A. The total purchase price for the property was $878,500.27. The purchase was made with funds from HSBC 7467.

63. On August 21, 2020, ApolloMDx transferred $20,500.00 from HSBC 7467 to Alamo Title Company as a down payment on the purchase of Stanford A.

64. On September 8, 2020, $858,000.27 was transferred from HSBC 7467 to Alamo Title Company to complete the purchase of Stanford A.

65. The LIBR analysis of the HSBC account 7467 shows that this purchase was entirely funded with proceeds from the illegal activity described above.

66. On April 23, 2021, title to Stanford A was transferred from ApolloMDx to 608 Stanford, LLC. On September 22, 2021, a Special Warranty Deed corrected the record title in the name of 608 Stanford St, LLC. The Special Warranty Deed reflects that Emylee Thai is the sole member of 608 Stanford St, LLC.

C. **310 Goddard**

67. On October 6, 2020, ApolloMDx purchased Defendant Property 310 Goddard. The total purchase price for the property was $3,750,000.00. The purchase was made with funds from HSBC 7467.

68. On October 1, 2020, a wire was sent to the escrow company handling the sale, Mariners Escrow, in the amount of $200,000.00 from HSBC 7467. A second transfer to Mariners Escrow was sent on November 30, 2020, from HSBC 7467 in the amount of $3,550,000.00.

69. The LIBR analysis of HSBC 7467 shows that this purchase was entirely funded with proceeds from the illegal activities described above.

70. On April 14, 2021, Thai created a California corporation named 310 Goddard LLC. California Secretary of State records reflect that Emylee Thai is the CEO and the only managing member of 310 Goddard LLC.

71. On April 23, 2021, title to 310 Goddard was transferred from ApolloMDx to 310 Goddard LLC.

72. According to a July 2021 filing with the California Secretary of State, the business address for ApolloMDx (then doing business as Artemis DNA) was 310 Goddard. In addition, the logo for Artemis DNA was displayed on the building.

**VI.   The Criminal Prosecution**

73.    Thai was indicted in the Southern District of Texas on July 12, 2022, Case No. 4:22-cr-329, for violations of 18 U.S.C. §1349 (Conspiracy to Commit Healthcare Fraud), 18 U.S.C. §371 (Conspiracy to Defraud the United States and Pay and Receive Health Care Kickbacks), and 42 U.S.C. §1320a-7b(b)(2)(B) (Payment of Kickbacks in Connection with a Federal Health Care Program), and 18 U.S.C. §2 (Aiding and Abetting). The indictment included a Notice of Criminal Forfeiture as to the Defendant Properties pursuant to 18 U.S.C. §§981(a)(1)(C), 982(a)(7), and 28 U.S.C. §2461(c). A superseding indictment, filed June 21, 2023, added Tran and Reynolds as defendants.

74.    While Thai was under the supervision of U.S. Pretrial Services, she requested permission from the Court to travel to Las Vegas, Nevada from December 1, 2022, through December 23, 2022, to take part in the World Poker Tour Championship Tournament. *See* Case No. 4:22-cr-00329, Dkt. 44. The Court granted her permission to travel for that purpose, but it required her to continue with her conditions of pretrial release, including wearing a GPS monitor. *Id.,* Dkt. 45. While in Las Vegas, Thai cut off her GPS monitor and fled the country. A warrant for her arrest was issued on December 9, 2022. She remains a fugitive at this time, and her criminal case is pending.

## CONCLUSION

75.    The Defendant Properties are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C).

## NOTICE TO ANY POTENTIAL CLAIMANT

The United States will serve notice, along with a copy of the Complaint, on the property owner(s) and on persons who reasonably appear to be potential claimants.

YOU ARE HEREBY NOTIFIED if you assert an interest in the property subject to forfeiture and want to contest the forfeiture, you must file a verified claim which fulfills the requirements set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. The verified claim must be filed no later than 35 days from the date this complaint was sent to you in accordance with Rule G(4)(b); or, if this Complaint was not sent to you, no later than 60 days after the first day of publication of notice on an official internet government forfeiture site, in accordance with Rule G(5)(a)(ii)(B).

An answer or a motion under Federal Rule of Civil Procedure 12 must be filed no later than 21 days after filing the claim. The claim and answer must be filed with the United States District Clerk for the Southern District of Texas, and a copy must be served upon the undersigned Assistant United States Attorney at the address provided in this Complaint.

## RELIEF REQUESTED

The United States seeks a final judgment forfeiting the Defendant Properties to the United States and requests any other relief to which the United States may be entitled.

Respectfully submitted,
ALAMDAR S. HAMDANI
United States Attorney

/s/ Elizabeth A. Wyman
Elizabeth A. Wyman
SDTX Federal No. 2294662
Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, Texas 77002
Telephone (713) 567-9000
Fax: (713) 718-3300

**Verification**

I, Joyce Combest, a Sergeant with the Texas Attorney General's Office Medicaid Fraud Control Unit ("MFCU") and a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI"), hereby verify under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the facts set forth in the foregoing Verified Complaint For Civil Forfeiture In Rem and Notice to Potential Claimants are based upon either personal knowledge or from information, reports, or records obtained during investigation and from other law enforcement personnel, and are true and correct to the best of my knowledge and belief.

Executed on  1/23/2025  .

_____
Joyce Combest
Investigator
Texas Attorney General, MFCU